UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ANDREW WILLIAMS,                        :
                         Plaintiff,     :
                                        :     02 Civ. 4558 (DLC)
            -v-                         :
                                        :     OPINION & ORDER
J (A) SMITH (FIRST DEPUTY SUPT.),       :
DR. J. PERILLI (F.H.S.D.),              :
MRS. CAPUANO (NURSE ADMIN.),            :
MR. WILLIAMS (PHYSICIAN ASSISTANT),     :
T.G. EAGAN (GRIEVANCE DIRECTOR),        :
SERGEANT KRUSEN,                        :
SERGEANT MACNAMARA,                     :
CORRECTION OFFICER CLARK,               :
CORRECTION OFFICER MALDONADO,           :
CORRECTION OFFICER GOFFE,               :
                         Defendants.    :
                                        :
----------------------------------------X

Appearances:

Pro se Plaintiff:
Andrew Williams
85-B-0689
99 Prison Road
Box 1000
Woodbourne, NY 12788


For Defendants:
Thomas M. Biesty
State of New York
Office of the Attorney General
120 Broadway
New York, NY 10271


DENISE COTE, District Judge:

       Andrew Williams ("Williams"), an inmate at Sing Sing

Correctional Facility ("Sing Sing"), has brought this pro se

civil rights action pursuant to 42 U.S.C. § 1983 against First Deputy Superintendent Joseph Smith ("Smith"), Facility Health Services Director John Perilli ("Perilli"), Nurse Administrator Kimberly Capuano ("Capuano"), Physician Assistant Phillip Williams ("P.A. Williams"), Grievance Director Thomas Eagan ("Eagan"), Sergeants John MacNamara ("MacNamara") and Robert Krusen ("Krusen"), and Corrections Officers John Clark ("Clark"), Enrique Maldonado ("Maldonado"), and Melvin Goffe ("Goffe") (collectively, "Defendants")[1] for their deliberate indifference to his serious medical needs in violation of the Eighth Amendment, and for retaliation in violation of the First Amendment.  Williams had an arthritic right knee and he injured his back in 1996.  He had back surgery in 1997.  This lawsuit complains that the defendants failed to accommodate these ailments following that surgery, in particular by denying him access to daily morning showers to relieve his back pain and requiring him to climb stairs despite his knee condition. Defendants have moved for summary judgment.  For the following reasons, summary judgment is granted in part.

---

[1] Williams also named Physical Therapist Mr. Abraham as a defendant in his Amended Complaint.  The Court noted in its September 18, 2003 Memorandum and Order that the plaintiff had provided no proof of service of Abraham.  Plaintiff having failed to cure this defect, this Order and Opinion does not address Williams's allegations concerning Abraham.

Background

     Unless otherwise noted, the following facts are undisputed.
While an inmate, Williams fell down a flight of stairs in 1996
and hurt his back, suffering multiple disc herniations.  In
December 1997, Williams underwent surgery for these injuries.
After he returned to Sing Sing later that month, he continued to
suffer from degenerative disc disease in his spine and a bulging
disc and herniation in his back.  In addition, he suffered from
arthritis in his right knee.

     Soon after Williams returned to Sing Sing following
surgery, Sing Sing began referring him to outside specialists
and physical therapists regularly, often multiple times per
month.  Between his 1997 surgery and the filing of this summary
judgment motion, he had over 100 medical consultations.  He was
regularly given pain and anti-inflammatory medication, was
provided with a back brace, and was issued medical passes that
were supposed to allow him to be moved to the flats,[2] to take a
daily shower, to use the elevator, to sleep on a firm bed, and
to be served dinner in his cell on a "feed-up" tray.[3]
Nonetheless, Williams experienced pain, tenderness, and

_____

[2] A flats pass allows an inmate to be housed on the first floor
of a facility so as to avoid climbing stairs.

[3] The pass allowing an inmate to have dinner delivered to his
cell is called a feed-up pass.

decreased range of motion in his back and legs through his filing of this suit in 2002.

Daily Morning Shower

Williams complained frequently about back pain that occasionally radiated to his shoulders, buttocks, and legs.  He had difficulty "bending, twisting, standing or sitting for long duration . . . [and] with certain movements and lifting heavy objects."  Williams also complained about pain, stiffness, tightness, and spasms in his back, particularly in the morning.  Outside specialists prescribed daily morning showers as heat treatment to alleviate these symptoms.

Inmates at Sing Sing are generally entitled to shower three evenings per week.  Beginning in 1999, Williams was issued a medical pass for a daily morning shower.  Despite his possession of that pass, Williams asserts that on occasion certain defendants refused to honor his right to a daily morning shower, and instead allowed him to shower only three evenings per week.

a. Goffe, Maldonado, MacNamara, Krusen and Smith

Williams presented a valid pass for his daily morning showers to officers Goffe and Maldonado for the first time on

4

April 30, 1999.[4]  Despite this pass, Goffe and Maldonado refused
to permit a morning shower, asserting their understanding that
administrative and safety considerations, as well as the housing
block operating policy, did not allow inmates to take morning
showers unless they were in keeplock (i.e., confined to their
cells) or were inmate porters.  Goffe and Maldonado consulted
their superiors Krusen and MacNamara in making this
determination.  After this incident, officers repeatedly refused
to honor his shower pass.  In September 1999, Williams filed a
grievance about the denial of his morning showers, which Smith
asserts he rejected in reliance on "the medical department's
conclusion that plaintiff did not need morning showers."  He
wrote on the denial that "although [Williams's] pass says AM
showers, block policy dictates otherwise," and "staff can find
no reason for AM shower."

  b. Capuano and Eagan

     When Williams's September 1999 grievance was denied, he
appealed to the Central Office Review Committee ("CORC") in
Albany.  CORC asked Nurse Capuano for information regarding the
underlying events.  According to Capuano, she spoke with Dr.
Perilli about Williams's case and then relayed to CORC that

---

[4] Williams's medical record shows that an outside specialist
first prescribed hot showers on April 23, 1999.  Before that
date, he was prescribed "moist heat" and heat packs.

Williams did not need daily morning showers.  Relying on evidence showing that Capuano spoke to Dr. Perilli on December 23, 1999, eight days after CORC had already denied Williams's grievance on December 15, and on evidence that Dr. Perilli did not withdraw the authorization for Williams to have a daily shower until the following year, Williams claims that Capuano never spoke to Dr. Perilli about this appeal, and instead changed Williams's treatment plan herself.

As Director of the Inmate Grievance Program for the New York State Department of Correctional Services, Eagan was responsible for the administrative function of the inmate grievance program.  Although was not a voting member of CORC, he signed the December 15, 1999 CORC decision.  Williams claims that Eagan was aware of Capuano's alleged misrepresentation and did not intervene.  Williams does not explain how Eagan learned of Capuano's alleged misrepresentation.

c. P.A. Williams

On July 31, 2000, an outside specialist wrote in Williams's medical chart "Daily shower X 3 mos (for lumbar pain) – AM." Williams claims that when P.A. Williams reviewed this instruction, he crossed out "AM" and wrote "not indicated, has daily shower written 6/27 X 3 mos."  P.A. Williams does not remember reviewing this entry for "AM" showers, and neither

admits nor denies that the handwritten annotation was his.  He
adds that if he altered the prescription for a pass, he did so
because it called for a morning shower, and the medical pass
form did not permit the designation of a time for showers.
Although he authorized thousands of daily shower passes, as a
general practice, he authorized passes for a certain time of day
"extremely rarely" because "facility, security and
administrative policies weighed against" doing so.

  d. Dr. Perilli

    Dr. Perilli began serving as Facility Health Services
Director in December 1999.  Williams had a daily morning shower
pass at that time and Dr. Perilli renewed it.  On October 16,
2000, however, Dr. Perilli reviewed Williams's medical chart and
wrote in it "no need for daily shower based on his medical
diagnosis."  At a November 16, 2000 consultation, Dr. Perilli
refused to renew Williams's pass for daily morning showers.  Dr.
Perilli noted in Williams's medical file on that date,
"discussion held about shower pass – [patient] has chronic back
problem.  I will recommend shower per block, but not daily
showers."

    Williams claims that Dr. Perilli denied his request for
daily shower passes at the November 16 meeting for non-medical
reasons.  Williams says that he told Dr. Perilli at the meeting

that he had filed grievances in September 1999 about the security staff not allowing him to take daily morning showers. In response, Dr. Perilli said "you file[d] grievance[s], oh I don't know about this," shook his head, and rescinded Williams's shower pass.  Williams also claims that Dr. Perilli told him at this meeting that he would no longer issue daily morning shower passes because the security staff did not want to honor them, and the administration wanted Dr. Perilli to reduce the number of medical passes issued.

On November 20, Dr. Perilli wrote in Williams's medical file

> I have reviewed ortho consultation 11-14-00 +
> recommendation for shower.  Any outside consultant
> recommendations are always subject to provider review
> + DOC policies.  As this is a chronic condition,
> there is no specific indicator for a daily shower
> (i.e., acute sprain, colostomies, etc.), but I will
> give shower per block [policy].

Subsequently, a number of outside specialists and physical therapists recommended daily morning showers, but Dr. Perilli repeatedly declined to issue Williams a pass for such showers, asserting it was not medically necessary.

  e. Williams's Assertions of Pain Related to Deprivation of
     Daily Morning Showers

On November 11, 1999, Williams reported to a physical therapist that his back pain was an eight out of ten in

8

intensity, and that this pain was relieved by hot showers.  At a physical therapy appointment on April 5, 2000, he reported that showers relaxed his back, and at an appointment eight days later, the physical therapist noted that Williams's back was responding to heat and stretching.  Williams asserts that he reported to an outside orthopedic specialist on November 14, 2000 that his back pain and spasms were reduced with heat treatment, but Williams's medical record does not reflect such a comment.

Williams's complaints about his back after Dr. Perilli terminated his shower pass on November 16, 2000 were similar to his complaints before.  In both time periods, he complained about back spasms, back pain radiating to other parts of his body, and difficulty sitting.  Williams does not make specific assertions, in either his medical records or in his opposition to this motion, that his back pain increased after Dr. Perilli terminated his daily morning shower pass.  On September 25, 2002, almost two years after Dr. Perilli initially denied Williams a daily morning shower pass, Williams reported his pain to be a persistent five to seven out of ten in intensity, a decrease from the eight he reported November 1999.

Climbing Stairs

Williams had right knee surgery in 1996.  Subsequently, he
suffered from arthritis, stiffness, limited range of motion, and
pain.  As a result, doctors recommended that Williams limit his
stair climbing.

a. Feed-Up and Flats Passes

Williams was issued feed-up and flats passes so he would
not have to climb stairs regularly.  He claims that he presented
valid feed-up and flats passes on April 30, 1999 to officers
Goffe and Maldonado.  Williams claims Goffe and Maldonado said
they would work on accomodating these passes.  A month and a
half later, Williams started receiving his feed-up tray.  He
does not claim defendants rejected his feed-up pass or directly
interfered with it in any way.  Goffe, Maldonado, and Krusen
assert that they had no role in determining whether Williams
should be served meals in his cell or in implementing such an
accommodation; Krusen asserts that he did not even know about
Williams's request.

Goffe, Maldonado, and Krusen claim they also had no role in
the decision to move Williams to a new cell.  Williams says
Goffe and Maldonado intentionally delayed his move to the flats,
never notified the appropriate authorities about his request,
and told him the more he asked the longer he had to wait to be

10

moved.  Williams does not explain how Krusen delayed his move to

the flats; he asserts only that Krusen told him that there was

no room in the flats and that a gallery officer would inform him

when there was room.  Williams claims that other inmates were

being moved to the flats ahead of him.  He was moved to the

flats in October 2000, eighteen months after first presenting

his flats pass.


  b. Fishkill Stairs

    Sing Sing sent Williams to Fishkill Correctional Facility

("Fishkill") for physical therapy from April 1999 through

December 2000.  Clark worked at Fishkill and escorted Williams

to the clinic there a number of times.  Williams claims that "on

approximately 10 occasions" Clark refused to allow Williams to

use the elevator, and, instead, made Williams walk up six

flights of stairs to the treatment unit, despite the fact that

he had an elevator pass at Sing Sing.  Williams claims that on

April 13, 2000, Clark told him the elevator was not working

properly and was only to be used in emergencies; after he walked

up the stairs, though, he saw other inmates using the elevator.

Williams refused to attend therapy sessions at Fishkill in

October, November, and December 2000.  He was discharged from

the Fishkill clinic in December because of his refusal to

attend, and he was immediately sent to another facility for therapy where he did not need to walk up stairs.

   c. Williams's Assertions of Pain Related to Climbing Stairs

     Over the course of the period in question, Williams complained about knee pain at dozens of medical consultations. He had limited range of motion in his right knee, complained about it giving out occasionally and being painful on range of motion tests, and he was diagnosed with right knee effusion.[5]

     Doctors recommended that he limit his stair climbing. Williams does not make specific assertions about the quantity or quality of pain he experienced directly related to climbing stairs.  He instead asserts generally that he had "perplexities" walking up stairs, and that he eventually refused to attend physical therapy at Fishkill because it was too painful to walk up six flights of stairs to the treatment unit.

Procedural History

     Williams filed an amended complaint on November 12, 2002. Defendants moved to dismiss the suit on January 22, 2003.  By a Memorandum and Order dated September 18, 2003, the Honorable Lawrence McKenna, to whom this case was then assigned, granted

---

[5] Knee effusion is a condition where excess fluid accumulates in and around the knee joint.

the motion to dismiss with respect to only one defendant,
Superintendent Brian Fisher.  Defendants filed a motion for
summary judgment on May 15, 2007, which became fully submitted
on March 5, 2009.  On June 5, 2009, this case was reassigned
from Judge McKenna to this Court.


DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the movant is entitled to a
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the
court must view all facts in the light most favorable to the
non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986); Sista v. CDC Ixis N. Amer., Inc., 445 F.3d 161, 169 (2d
Cir. 2006).  When the moving party has asserted facts showing
that the non-movant's claims cannot be sustained, the opposing
party must "set out specific facts showing a genuine issue for
trial," and cannot rest "merely on allegations or denials in its
own pleading."  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at
169.  "It is well established that the submissions of a pro se
litigant must be construed liberally and interpreted to raise

13

the strongest arguments that they <u>suggest</u>."   <u>Triestman v. Fed.</u>

<u>Bur. of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)

(citation omitted).

This Opinion first addresses Williams's Eighth Amendment

claim, discussing in turn: personal involvement, deliberate

indifference, and qualified immunity.   This Opinion then

discusses Williams's First Amendment retaliation claim.


<u>Personal Involvement</u>

Defendants Smith and Eagan move for summary judgment on the

ground that they were not personally involved in the alleged

deprivation of Williams's rights.   Section 1983 provides in part

that

> [e]very person who, under color of any statutes,
> ordinance, regulation, custom or usage, of any State
> . . . subjects, or causes to be subjected, any
> citizen of the United States . . . to deprivation of
> any rights, privileges, or immunities secured by the
> Constitution and laws shall be liable to the party
> injured.

42 U.S.C. § 1983.   To state a claim under Section 1983, a

plaintiff must show: "(1) actions taken under color of law; (2)

deprivation of a constitutional or statutory right; (3)

causation; (4) damages."   <u>Roe v. City of Waterbury</u>, 542 F.3d 31,

36 (2d Cir. 2008).

A defendant's conduct must be a proximate cause of the

claimed violation in order to find that the defendant deprived

the plaintiff of his rights.  Martinez v. California, 444 U.S. 277, 285 (1980).  As a consequence, "the doctrine of respondeat superior . . . does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003); see also Reynolds v. Giuliani, 506 F.3d 183, 190-191 (2d Cir. 2007) (discussing municipal liability).  It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted); accord Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act."  Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (citation omitted); Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999).  Thus, a plaintiff may establish a supervisor's personal involvement by showing that the supervisor:

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who

committed the violation, or (5) was deliberately
indifferent to the rights of others by failing to act
on information that constitutional rights were being
violated.

Iqbal v. Hasty, 490 F.3d 143, 152-153 (2d Cir. 2007) (citation
omitted).

Defendants argue that Smith and Eagan are entitled to
summary judgment as they were not personally involved in the
alleged deprivation of Williams's rights.  Williams has not
asserted that either Eagan or Smith were directly involved in
interfering with Williams's medical treatment.  Williams instead
argues that Eagan is liable because he was aware of Capuano's
alleged misrepresentation and failed to intervene.  Williams has
failed, however, to explain how Eagan became aware of Capuano's
alleged misrepresentation or how he was otherwise personally
involved in the deprivation of his rights.  Eagan is therefore
entitled to summary judgment.

Williams argues that Smith was personally involved in
depriving Williams of his rights by denying Williams's
grievance.  Under Second Circuit law, it is "questionable"
whether Smith's denial of Williams's grievance constitutes
sufficient personal involvement to make him liable.  McKenna v.
Wright, 386 F.3d 432, 437-38 (2d Cir. 2004).  See also Rahman v.
Fisher, 607 F. Supp. 2d 580, at 585 (S.D.N.Y. 2009) (personal
involvement may exist where supervisor fails to act on reports

of violation and violation continues).  It is not necessary to reach this issue, though, as Smith is entitled to summary judgment on Williams's deliberate indifference claim for other reasons, as discussed below.

Deliberate Indifference

All of the defendants argue that Williams has failed to show that he suffered a serious lapse in care for his back and knee conditions or that the defendants were deliberately indifferent to his medical needs.  Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). "[A] prison official violates the Eighth Amendment only when two requirements are met."  Id. (citation omitted).  The first requirement is that the alleged deprivation must be "sufficiently serious."  Id. (citation omitted).  The second requirement is that "the charged official must act with a sufficiently culpable state of mind."  Id. at 280.

To determine whether the deprivation was sufficiently serious, a court must first ascertain whether "the prisoner was actually deprived of adequate medical care," keeping in mind that "the prison official's duty is only to provide reasonable

17

care." Id. at 279.  An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable.  Estelle v. Gamble, 429 U.S. 97, 107 (1976). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain.  Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984).

A court must consider whether any deprivation was itself "sufficiently serious."  Salahuddin, 467 F.3d at 280.  This inquiry requires an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Id.  If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."  Id. If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."  Id.  Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).  Even in

cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim.  Id.  "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  Id. at 187.

"Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case."  Id. at 185 (citation omitted).  Courts use a number of factors to determine whether a medical condition is serious.  These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain."  Salahuddin, 467 F.3d at 280 (citation omitted).  "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  Id. at 279 (citation omitted).

Second Circuit decisions have primarily discussed the serious medical need standard in the context of total failures to treat underlying medical conditions.  Smith, 316 F.3d at 184 n.8.  In this context, courts in this district have determined that claims that fail to meet the constitutional standard of seriousness include: a "cut finger, even where skin is ripped off," Sonds v. St. Barnabas Hosp. Correctional Health Servs., 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001); a broken finger, Henderson v. Doe, No. 98 Civ. 5011 (WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999); and a foot condition involving a fracture, bone cyst and degenerative arthritis, Veloz v. New York, 35 F. Supp. 2d 305, 312 (S.D.N.Y. 1999).  Claims that have met the constitutional standard of seriousness include failures to treat, inter alia: a painful facial keloid scar, Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003); a dental cavity at risk of "acute infections, debilitating pain and tooth loss," Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000); abscessed teeth causing "great pain" for six months and tooth degeneration, Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998); ruptured Achilles tendon that resulted in swelling and pain, Hemmings v. Gorczyk, 134 F.3d 104, 106-09 (2d Cir. 1998) (per curiam); eye problems that resulted in loss of vision in one eye, Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996); and

three-year extreme hip pain caused by embedded broken pins,
Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994).

The question of whether persistent back pain rises to a
level of constitutional significance depends upon the
circumstances of the particular case presented.  Compare Mendoza
v. McGinnis, No. 05 Civ. 1124 (TJM/DEP), 2008 WL 4239760, *10
(N.D.N.Y. Sept. 11, 2008) (finding degenerative disc disease to
constitute a serious medical need); Guarneri v. Hazzard, No. 06
Civ. 0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008)
("Severe back pain, especially if lasting an extended period of
time, can amount to a serious medical need under the Eighth
Amendment.") (citation omitted); Faraday v. Lantz, No. 03 Civ.
1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005)
(persistent complaints of "lower back pain caused by herniated,
migrated discs [and] sciatica" leading to severe pain
constitutes a serious medical need), with Cain v. Jackson, No.
05 Civ. 3914 (LAP), 2007 WL 2193997, *6 (S.D.N.Y. July 27, 2007)
(degenerative disc disease in cervical spine, which was
compounded when plaintiff fell from her cell bunk and injured
her back, was not sufficiently serious); Jackson v. Fairchild,
No. 04 Civ. 73 (FJS/DRP), 2007 U.S. Dist. LEXIS 17497, *5, *9
(N.D.N.Y Mar. 12, 2007) (back pain did not constitute serious
medical need where despite being seen frequently by prison
medical officials, plaintiff "did not voice a significant number

of concerns regarding pain, nor did he request pain medication
beyond simple Ibuprofen and similar over-the-counter
medications."); Veloz v. New York, 339 F. Supp. 2d 505, 522-26
(S.D.N.Y. 2004) (plaintiff's chronic back pain and mild to
moderate degenerative arthritis of spinal vertebrae did not
establish a serious medical need); Davis v. Reilly, 324 F. Supp.
2d 361, 368 (E.D.N.Y. 2004) (A "sprained back and neck . . . do
not constitute a serious medical condition.").

To show that a defendant acted with a sufficiently culpable
state of mind, "it suffices if the plaintiff proves that the
official acted with deliberate indifference to inmate health,"
which "is a mental state equivalent to subjective recklessness,
as the term is used in criminal law." Salahuddin, 467 F.3d at
280. "This mental state requires that the charged official act
or fail to act while actually aware of a substantial risk that
serious inmate harm will result." Id.

Prison medical staff is given wide discretion in
determining how to treat inmates. In this context, "[t]he
decisions of physicians regarding the care and safety of
patients are entitled to a presumption of correctness." Kulak
v. City of New York, 88 F.3d 63, 77 (2d Cir. 1996) (citation
omitted); Church v. Hegstrom, 416 F.2d 449, 450 (2d Cir. 1969)
(Section 1983 "does not authorize federal courts to interfere in
the ordinary medical practices . . . of state prisons."). As

such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim.  Chance, 143 F.3d at 703.  Moreover, a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference. See, e.g., Revenell v. Van Der Steeg, No. 05 Civ. 4042 (WHP), 2007 U.S. Dist LEXIS 17868, *16-17 (S.D.N.Y. Mar. 14, 2007); Sully-Martinez v. Glover, No. 00 Civ. 5997 (GEL), 2001 WL 1491278, *4 (S.D.N.Y. Nov. 26, 2001).

Non-medical prison staff cannot, however, alter an inmate's treatment plan.  "Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."  Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987).  "[A] deliberate indifference claim can [therefore] lie where prison officials deliberately ignore" such medical recommendations.  Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005).


a. Shower Pass

Defendants argue that they are entitled to summary judgment because the denial of Williams's daily morning showers did not cause a serious enough injury to sustain an Eighth Amendment claim.  Defendants point to the fact that Williams received

extensive treatment for his back, including surgery, pain and anti-inflammatory drugs, a back brace, and regular physical therapy sessions, which Williams admits helped the very back condition for which the showers were prescribed.  Dr. Perilli opines that denial of Williams's daily showers did not create a serious risk of harm.  Williams does not show that he suffered greater back pain in the periods when he was denied daily morning showers than when he was permitted them.  In fact, almost two years after Dr. Perilli refused to renew Williams's shower pass, Williams reported his back pain to be somewhat less intense than it was during a period when he was taking daily morning showers.  Moreover, Williams has made no showing that the lack of showers affected his daily activities.

Williams does, however, show contemporaneous reports by him and by his doctors that daily morning showers helped his painful back condition.  In addition, outside specialists repeatedly found Williams's back condition and his need for daily morning showers worthy of comment.  Moreover, a failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care.  See Salahuddin, 467 F.3d at 281 (applying presumption that five month failure to treat pain causes sufficiently serious harm).  This is true even when other, substantial medical care is given for the underlying condition.

24

Although the record suggests that Williams may have difficulty meeting the seriousness inquiry at trial, all inferences must be drawn in Williams's favor at the summary judgment stage, particularly because he is proceeding pro se.  As such, although not every denial or even series of repeated denials of medical showers constitutes a serious medical injury, the record does not permit a finding as a matter of law that the deficiency in Williams's treatment was "minor and inconsequential," or that the deficiency did not create "a significant risk of serious harm."  Smith, 316 F.3d at 187.  Williams's papers must be read as showing that for approximately a year and a half, until Dr. Perilli revoked his medical pass for daily morning showers, the defendants denied him medically prescribed treatment for the chronic pain he experienced due to a back injury from which no one disputes that Williams suffered.

Defendants argue that they are entitled to summary judgment on the second prong of the deliberate indifference inquiry. Indeed, Smith and Dr. Perilli are.  Smith asserts that he deferred to the medical staff's recommendation to deny Williams's grievance.  Williams does not contest that Smith did so; and Williams offers no evidence that raises a question as to whether Smith actually took this course of action or whether this course of action reflected recklessness.  Dr. Perilli shows that in his medical opinion he determined daily morning heat

25

treatment was no longer necessary for Williams's condition.  As discussed below, Williams attempts but fails to raise a question as to whether Dr. Perilli's decision was based on an ulterior motive rather than on medical judgment.  Williams therefore has not raised a question of material fact as to whether Dr. Perilli acted with the intent necessary to satisfy the second prong of the deliberate indifference inquiry.  Both Smith and Dr. Perilli are therefore entitled to summary judgment.

None of the remaining defendants identified as depriving Williams of a medically prescribed shower are entitled to full summary judgment on this prong.  It is undisputed that Williams presented a valid medical pass for morning showers and that Goffe, Maldonado, Krusen and MacNamara did not honor that pass. Despite these defendants' claims that they were following facility protocol, a reasonable jury could conclude that their disregard of a medical pass constituted recklessness.  P.A. Williams's assertion that if he changed Williams's prescription of morning showers he did so to comply with facility protocol is subject to the same analysis.  As for Capuano, evidence suggesting that she changed Williams's treatment plan without consulting Dr. Perilli raises a question of material fact as to whether she acted not just recklessly but intentionally.  None of these defendants is therefore entitled to full summary

judgment on Williams's deliberate indifference claim related to
shower passes.

Goffe, Maldonado, Krusen, and MacNamara, are, however,
entitled to partial summary judgment.  After Dr. Perilli
rescinded Williams's shower pass on November 16, 2000, these
defendants were entitled to rely on Williams's lack of a valid
medical pass to deny him daily morning showers.  Williams has
raised no question of material fact about whether these
defendants acted recklessly in denying him daily morning showers
after he no longer possessed a shower pass.

b. Climbing Stairs

Defendants are entitled to partial summary judgment on
Williams's deliberate indifference claims related to climbing
stairs.  Dr. Perilli opines that climbing stairs at Fishkill
when Clark refused to honor Williams's elevator pass and
climbing stairs at Sing Sing when Williams's feed-up and flats
passes were delayed did not create a serious medical risk of
death, degeneration, or extreme pain.  Although Williams has
made only a limited showing about the pain climbing stairs
caused him, he has asserted that climbing stairs did cause him
pain, and outside specialists found the issue worthy of comment,
and recommended that he avoid climbing stairs.  Moreover, the
pain of climbing stairs was apparently intense enough to cause

Williams to choose not to attend physical therapy sessions that required him to walk up stairs.  Although a serious medical injury is not inflicted every time an inmate with a bad knee is required to climb stairs, in this case, with all inferences drawn in his favor, Williams has raised a question of material fact as to whether the pain caused by climbing stairs was serious enough to sustain an Eighth Amendment claim.

Goffe, Maldonado, and Krusen are entitled to summary judgment on Williams's deliberate indifference claim related to his feed-up pass.  They claim that they were not responsible for accommodating Williams's feed-up pass, and Williams offers no evidence that they interfered with his pass being accommodated.  Krusen is entitled to summary judgment for Williams's claim related to his flats pass, as well.  Williams asserts that he had a conversation with Krusen about the delay in accommodating his pass, but he does not explain how Krusen was responsible for that delay.  Goffe and Maldonado are not, however, entitled to summary judgment related to the flats pass claim.  Despite their assertions that they had no responsibility for accommodating this pass, Williams's assertions that they threatened to delay his move, paired with the fact that his flats pass was not accommodated until eighteen months after his first conversation with Goffe and Maldonado, raise a question of material fact as to whether they did interfere with his move and thereby acted

recklessly.  Although an ordinary delay in moving an inmate to a new cell to accommodate his medical condition would not constitute a serious medical injury, Williams has alleged that these defendants intentionally delayed his move to the flats for a year and a half, while other inmates were getting moved there ahead of him.

Clark is not entitled to summary judgment.  There is no dispute that Clark knew that Williams had an elevator pass due to his knee condition.  Although Clark asserts that he denied Williams access to an elevator because the Fishkill elevator had maintenance problems and was only to be used for emergencies, Williams's assertion that he saw inmates using the elevator has raised a question of material fact as to whether Clark acted intentionally or recklessly in denying Williams use of the elevator.  While an occasional denial of access to an elevator would not rise to the level of serious injury to Williams's health, Williams has alleged that Clark repeatedly, and without justification, refused over a period of months to allow Williams to use the elevator.

Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known." Pearson v. Callahan, 129 S.Ct. 808, 815 (2009)

(citation omitted).  In determining whether a defendant is

entitled to qualified immunity, the "appropriate question is the

objective inquiry whether a reasonable officer could have

believed that his actions were lawful in light of clearly

established law and the information the officer possessed."

Kelsey v. County of Schohaire, 567 F.3d 54, 61 (2d Cir. 2009)

(citation omitted).  To assess a qualified immunity claim, a

court must therefore consider:

> (1) whether the right in question was defined with
> reasonable specificity; (2) whether the decisional
> law of the Supreme Court and the applicable circuit
> court support the existence of the right in
> question; and (3) whether under preexisting law a
> reasonable defendant official would have understood
> that his or her acts were unlawful.

Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir. 2005) (citation

omitted).

     Williams has defined with sufficient specificity the Eighth

Amendment right upon which his deliberate indifference claim

rests; and the Supreme Court and Second Circuit have clearly

established that right.  As for the third prong, Goffe,

Maldonado, Krusen, MacNamara, P.A. Williams and Capuano cannot

avail themselves of qualified immunity as they are all alleged

to have knowingly disregarded or altered Williams's medical

passes or treatment plan, which was unlawful.  See Gill, 824

F.2d at 196.  Bald assertions by Goffe, Maldonado, Krusen, and
MacNamara that they took their respective actions to comply with
administrative and safety concerns do not provide an adequate
ground for finding these actions objectively reasonable.  These
defendants have not explained the bases of their administrative
and safety concerns or how their actions addressed those
concerns.  It is therefore impossible at this point to determine
as a matter of law that these defendants acted reasonably in
choosing to serve those purposes rather than honor Williams's
medical passes and treatment plans.  If Capuano is liable to
Williams, it is because she unilaterally changed his treatment
plan.  Although she contests the underlying allegation that she
altered his plan, she offers no explanation of why a defendant
who does, in fact, take such actions could reasonably believe
she is acting lawfully.  P.A. Williams offers a potential
explanation for his actions, suggesting it was impossible for
him to grant Williams's prescription for a morning shower pass
because there was no place on the standard pass to indicate
timing of showers.  P.A. Williams's acknowledgment, however,
that he has authorized medical passes for a certain time of day,
albeit rarely, undercuts his explanation of why he overrode
Williams's prescription in this case.  He therefore offers an
inadequate explanation of why a reasonable officer in his
position would feel his actions were lawful.

Retaliation

To prove a First Amendment retaliation claim, "a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 554 F.3d 216, 227 (2d Cir. 2009) (citation omitted). Exercising the right to petition for redress of a grievance is protected conduct. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal, 554 F.3d at 228. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Williams claims that after he filed a grievance in September 1999 about the security officers denying his morning shower pass, Dr. Perilli retaliated against him by rescinding Williams's daily morning shower pass on November 16, 2000.

32

Williams argues that there was a temporal connection between these two events, because Dr. Perilli did not know about the grievances until Williams told Dr. Perilli about them at the November 16 meeting.  This argument fails.  Dr. Perilli made a note one month before the November 16 meeting concluding that Williams had no medical reason for daily morning showers.  This prior note requires a finding that Dr. Perilli had a proper reason to deny Williams a morning shower pass even after Williams described his grievance filing to Dr. Perilli. Williams has thus failed to raise a question of material fact as to whether Dr. Perilli's allegedly retaliatory action was causally related to Williams's filing of grievances.  Dr. Perilli is therefore entitled to summary judgment on the retaliation claim.

CONCLUSION

    Defendants' May 15, 2007 motion for summary judgment is granted in full as to Dr. Perilli, Eagan, and Smith.  Summary judgment is also granted as to Goffe, Maldonado, Krusen, and MacNamara for Williams's deliberate indifference claim related to his shower pass after November 11, 2000; summary judgment is granted as to Goffe, Maldonado, and Krusen for Williams's deliberate indifference claim related to his feed-up pass; and summary judgment is granted to Krusen for Williams's deliberate

indifference claim related to his flats pass.  Summary judgment

is denied in all other respects as to defendants Goffe,

Maldonado, Krusen, MacNamara, P.A. Williams, Capuano, and Clark.

SO ORDERED:

Dated:    New York, New York
          August 10, 2009

                                      _____
                                      DENISE COTE
                                      United States District Judge